**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JOHN T. MALTAS, as Personal
Representative of the Estate of
Richard B. Maltas,

　　　　　　*Plaintiff-Appellant,*

　　　v.

MICHAEL L. MALTAS; MARY ELLEN
MALTAS,

　　　　　　*Defendants-Appellees.*

No. 02-1605

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CA-00-3671-AMD)

Argued: April 1, 2003

Decided: June 12, 2003

Before NIEMEYER, MOTZ, and GREGORY, Circuit Judges.

---

Reversed and remanded by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Henry Mark Stichel, GOHN, HANKEY & STICHEL,
L.L.P., Baltimore, Maryland, for Appellant. Douglas Clark Hollmann,
Annapolis, Maryland, for Appellees. **ON BRIEF:** Benjamin D.
Hinceman, GOHN, HANKEY & STICHEL, L.L.P., Baltimore, Mary-
land, for Appellant.

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Richard Brian Maltas ("Ben")[1] brought this diversity action against
his son, Michael T. Maltas ("Michael"), and Michael's wife, Mary
Ellen Maltas ("Mary Ellen"). In his complaint, Ben alleged, *inter alia*,
that Michael and Mary Ellen took advantage of Ben's confidential
relationship with them and unduly influenced him to transfer
$100,000 for the purchase of Michael and Mary Ellen's Connecticut
home. The district court granted summary judgment in favor of
Michael and Mary Ellen, concluding that there was no evidence to
support a finding of a confidential relationship or the exercise of
undue influence. Ben then filed this appeal. Because we find that
there is a material issue of fact in dispute, we reverse and remand the
case for further proceedings consistent with this decision.

I.

Ben and his wife, Virginia Maltas, were married in 1942, lived in
Connecticut, and raised seven children: Richard Brian Maltas
("Brian"), Virginia Maltas, John Thomas Maltas ("Tom"), George
Maltas, Michael, Jeanne Maltas, and Patrice Maltas. Because of a
childhood head injury, Ben had limited faculties, thus, Virginia was
responsible for conducting the family's financial affairs and managing
their assets until her death in 1991.

Ben relied on Brian and Michael and their respective spouses, Mar-
ilyn and Mary Ellen, to conduct his financial affairs after his wife
died. Shortly after she passed away, Ben stayed with Brian and his
family for a few weeks and then traveled to Alaska to stay with Tom

---

[1] Ben passed away in April 2001, and John Thomas Maltas ("Tom"),
Ben's son and the personal representative of his estate, was substituted
as plaintiff in this action.

and his family for a few weeks. While Ben was in Alaska, and presumably with his permission, Brian and Michael arranged to sell their parent's home in Connecticut. In September 1999, Brian and Michael sold their parent's home for $202,500. After the mortgage, real estate commissions, and legal fees were satisfied, Ben received $117,115 from the proceeds of the sale, which represented his net worth.

During this time, Ben expressed a desire not to live alone; at the same time, Michael and Mary Ellen were looking to purchase a home but could not afford to do so on their own. In order to accommodate Ben's and Michael's needs, Brian and Michael devised a plan whereby Ben would use a portion of the proceeds from the sale of his marital home to provide the down payment for Michael and Mary Ellen's home. In return, Michael and Mary Ellen promised to provide Ben with a place to live for the rest of his life. In September 1991, Ben transferred $100,000 to Michael and Mary Ellen to purchase a home located on Sylvan Drive in Ridgefield, Connecticut. The new house cost $212,500. Of the $100,000 that Ben gave to them, Michael and Mary Ellen used $78,000 as a down payment on the home. They obtained a mortgage of $135,000 to finance the rest of the purchase price. Ben, Michael, and Mary Ellen agreed that the remainder of the $100,000 — $22,000 — would be used to fund construction of an addition to the new home, which would provide Ben with more privacy.

In November 1991, Ben, Michael, Mary Ellen and their three children moved into the Ridgefield home. Ben lived in the basement of the home, next to the garage and utility room. Instead of building the addition with the $22,000 Ben provided, Michael and Mary Ellen used the money to pay for household expenses, including the mortgage, utility and heating bills. According to Mary Ellen, Ben was aware that his money was being used in this manner.

In January 1992, Ben, Brian, Marilyn, Michael, and Mary Ellen met with James Mannion, a Connecticut attorney who had been Brian's lawyer for many years. Mannion was asked to draft a quit claim deed (the "1992 Deed"), which would protect Ben's interest in the Ridgefield residence. The 1992 Deed provided: (1) that Ben had a life estate in the home; and (2) that should Michael and Mary Ellen move further than 75 miles from Ridgefield, Connecticut, Ben would

be entitled to repayment of either $78,000 or a payment comprised of $78,000 minus $1,000 for each month Ben resided with Michael and his family. The 1992 Deed also contained a condition requiring Ben to forfeit his life estate should he remain absent from the home for a six-month consecutive time period.[2] The deed, however, did not contain any provision providing for the repayment of the $22,000 that was designed to fund construction of an addition to the home. During their meeting with Mannion, Ben asked Michael about repayment of this money, to which Michael responded, "[D]on't worry about it Pop, that's between you and me."

In 1993, Michael and Mary Ellen sought to refinance the mortgage on their home. Ben's life estate in the Connecticut residence, as memorialized in the 1992 Deed, however, prevented them from refinancing their mortgage. Michael contacted Mannion and scheduled a meeting to discuss drafting a new quit claim deed (the "1993 Deed"), which would remove the encumbrance contained in the 1992 Deed. Mannion drafted the 1993 Deed and met with Michael and Ben to discuss the impact of the new deed on Ben's legal rights in the Connecticut home. According to Mannion, he thoroughly explained to Ben the legal effect of releasing the 1992 Deed. Mannion testified that Ben appeared lucid, understanding, and responsive to Mannion's explanations of the impact of the 1993 Deed. After Mannion explained the impact of the 1993 Deed, Ben signed the deed thereby releasing his interest in the house. Neither Ben, Michael nor Mary Ellen disclosed the existence of the 1993 Deed to the remaining family members.

In 1994, Ben traveled to Alaska to visit his son, Tom. He decided to reside permanently with Tom and became a resident of Alaska. With the exception of a few brief visits to Connecticut, Ben never returned to live in Michael's and Mary Ellen's home. Until 1996, Michael and Mary Ellen remained in the Connecticut house and stored Ben's belongings and tools. Michael and Mary Ellen left Ben's apartment empty in case he decided to return to Connecticut.

---

[2]According to Mannion, he inserted this condition in the 1992 Deed to protect Michael and Mary Ellen from the effects of the Medicaid Act in the event that Ben required nursing home care and could not sign a release of the lien created by the 1992 quit claim deed.

In 1996, Michael's employer transferred him to Maryland. Michael, Mary Ellen, and their three children moved to Maryland and leased their Connecticut home for two years before deciding to sell the home in 1999. The house sold for $249,000, and after the mortgage, real estate commissions, and fees were paid, Michael and Mary Ellen received $87,036.70. They used $60,440.47 of that amount as a down payment on a new residence in Riva, Maryland. It was during this time that Marilyn, Brian's wife, discovered the 1993 Deed. She disclosed this information to Brian and Tom who urged Ben to contact Michael and Mary Ellen to ask that they repay a portion of the money that Ben had given them in 1991. Michael and Mary Ellen insisted that they did not owe any money to Ben but were willing to refund Ben a portion of the money he had given them. However, Ben, Michael, and Mary Ellen could not agree on the amount of money that should be repaid to Ben.

In August 1999, Tom arranged for Ben to meet with Leroy DeVeaux, an Alaskan attorney, to discuss the 1992 and 1993 deeds and Ben's legal rights with respect to the money he transferred to Michael and Mary Ellen in 1991. DeVeaux explained to Ben and Tom the legal effect of the 1993 Deed on the terms contained in the 1992 Deed. According to DeVeaux, Ben "was extremely surprised and agitated" to learn that he had released his rights in the Connecticut home when he signed the 1993 Deed. Based on Ben's reaction to DeVeaux's explanation of the effect of the 1993 Deed, DeVeaux opined that Ben had "no concept of the meaning and significance of the documents."

On several different occasions after his meeting with DeVeaux, Ben demanded repayment from Michael and Mary Ellen. The amounts Ben requested in repayment varied from $35,500 to $25,000 repaid over 10 years and a life estate in the Maryland residence to $5,500 for a car loan. Although Michael and Mary Ellen continued to argue that they were not legally obligated to pay Ben, they eventually agreed to pay him $5,000 in September 1999.

Ben, however, was not satisfied with the $5,000 he received from Michael and Mary Ellen. After making several demands that Michael and Mary Ellen repay a larger portion of the $100,000 he transferred to them in 1991, Ben filed this diversity action against them in federal

district court in Maryland in December 2000. His complaint contained claims of, *inter alia*, undue influence, abuse of confidential relationship, constructive trust and unjust enrichment. Ben passed away in April 2001, at which time his son, Tom, was substituted as plaintiff in this suit. Shortly thereafter, Michael and Mary Ellen moved for summary judgment, which the district court granted on April 26, 2002. Tom, on behalf of Ben's estate, filed a motion for reconsideration, which the district court denied. Tom then timely filed this appeal.

## II.

This Court reviews the district court's grant of summary judgment *de novo. See A.T. Massey Coal Co., Inc. v. Massanari*, 305 F.3d 226, 235 (4th Cir. 2002). Summary judgment is appropriate where "there is no genuine issue of material fact . . . and the moving party is entitled to summary judgement as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, all reasonable inferences must be drawn in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation & citation omitted).

## III.

When this Court is asked to resolve appeals such as this, the difficulty lies not in the legal questions but in our recognition that resolving the legal issues does little to heal the emotional wounds created by the circumstances surrounding the lawsuit itself. The circumstances surrounding this lawsuit involved an oral agreement between Ben and Michael whereby Ben agreed to provide $100,000 to Michael to purchase a new home in exchange for Michael's promise to care and provide housing for Ben for the rest of his life. Indeed, the parties do not dispute that such an arrangement was entered into by Ben, Michael and Mary Ellen in 1991. Where the parties differ is upon the terms of that agreement.

It is well-established under Connecticut law[3] that "[w]hether a trust has been created depends upon the intent of the settlor and of the trustee." *Colonial Bank & Trust Co. v. Matoff*, 556 A.2d 619, 623 (Conn. App. 1989) (citing *Hansen v. Norton*, 374 A.2d 230 (Conn. 1977)). In fact, Connecticut courts have been willing to find the existence of a trust based upon the parties' oral agreement where the intent to create the trust is evident. *See, e.g.*, *id.* at 623 (upholding the trial court's finding that a trust relationship based upon the parties' oral agreement that defendant hold plaintiff's money for plaintiff's care and support); *see also Hansen*, 374 A.2d at 296 ("An oral declaration may be sufficient to create an *inter vivos* trust of personal property, even without consideration and without delivery."). The relevant inquiry, therefore, addresses the intention of the parties at the time of the transfer. *See Spatola v. Spatola*, 492 A.2d 518, 520 (Conn. App. 1985).

Ben argues that at the time he transferred $100,000 to Michael, he intended that $78,000 be used for the down payment on the Ridgefield residence and that $22,000 be used to construct an addition for his privacy. Ben claims that he transferred the money to Michael upon the mutual understanding that Michael would repay the $78,000 received for the down payment on the Connecticut home. To buttress this argument, Ben points to the 1992 deed, which is, according to Ben, a written memorialization of their original oral agreement. The purpose of the 1993 deed, Ben claims, was not to amend the original oral agreement but simply to allow Michael and Mary Ellen to refinance their mortgage.

Michael and Mary Ellen, on the other hand, argue that when Ben transferred $100,000 to them in 1991, there was no specific agreement as to how those funds would be used. To this end, Michael and Mary Ellen contend that the parties' oral agreement consisted solely of Ben's promise to transfer $100,000 to Michael and Mary Ellen to purchase a new house in exchange for their promise to provide Ben with a place to live for the rest of his life. According to Michael and Mary Ellen, prior to the 1992 Deed, the parties never discussed whether Michael and Mary Ellen would repay Ben any amount of money. They also contend that to the extent that Ben was entitled to

---

[3]The parties do not dispute that Connecticut law applies in this case.

repayment of $78,000 under the 1992 deed, the terms of the 1993 deed abrogated that obligation.

As noted above, the parties do not dispute that Ben, Michael and Mary Ellen entered an oral agreement in which Ben agreed to provide $100,000 to Michael and Mary Ellen to purchase a new home in exchange for Michael and Mary Ellen's promise to care and provide housing for Ben for the rest of his life. The parties, however, dispute the exact terms of their 1991 oral trust agreement. Because their disagreement creates a genuine issue of material fact, we reverse the district court's grant of summary judgment to Michael and Mary Ellen.

*REVERSED AND REMANDED*